**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RELIGIOUS RIGHTS FOUNDATION OF PA, *et al.*, | No. 23-CV-01144 |
| Plaintiffs, | (Chief Judge Brann) |
| v. | |
| STATE COLLEGE AREA SCHOOL DISTRICT, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

**DECEMBER 1, 2023**

Not all parents wish to educate their children in the public school system. Some parents send their children to charter schools. Others educate their children through home schooling. Still others send their children to parochial schools, believing that integrating religious and secular instruction is integral to their faith. In this case, State College Area School District permits homeschooled and charter-schooled students living within the district to participate in its extracurricular opportunities, but denies that opportunity to students at parochial schools. But the Free Exercise Clause is clear: regardless of what reasons some parents may have for sending their children to a non-public school, a religious reason has the same value as a secular reason. If some exemptions are made, a school's refusal to make a religious one enforces a value judgment preferring secular conduct over religious

conduct. Because Plaintiffs have adequately alleged that the policy in this case runs afoul of that basic principle, the Defendants' motion to dismiss is denied.

## I.     BACKGROUND

In July 2023, Religious Rights Foundation of Pennsylvania, ("RRFP"), C.Y., L.Y., F.Y., B.H., K.H., and R.H., filed a two-count complaint against State College Area School District ("SCASD") and the Board of School Directors of the State College Area School District (the "Board").[1] In September 2023, Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.[2] The motion is now ripe for disposition.

## II.    DISCUSSION

### A.      Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[3] and *Ashcroft v. Iqbal*,[4] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[5] The United States Court of Appeals for the Third Circuit has instructed

---

[1]   Doc. 1.
[2]   Doc. 9.
[3]   550 U.S. 544 (2007).
[4]   556 U.S. 662 (2009).
[5]   *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[6]

## B.    Facts Alleged in the Complaint

The facts alleged in the complaint, which this Court must accept as true for the purposes of this motion, are as follows.

RRFP is a Pennsylvania non-profit corporation organized and located in Centre County, Pennsylvania.[7] Plaintiffs C.Y. and L.Y. are parents of F.Y., and Plaintiffs B.H. and K.H. are parents of R.H.[8] C.Y., L.Y., B.H., and K.H. (the "parent plaintiffs") are members of RRFP.[9] F.Y. and R.H. are minor children who attend parochial schools.[10] All of the individual plaintiffs are residents of the SCASD, a public school district, which is governed by the Board.[11] The Board has statutory authority to set various eligibility rules for its extracurricular programs.[12]

---

[6]   *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

[7]   Doc. 1 ¶1.

[8]   *Id.* ¶¶4, 7.

[9]   *Id.*

[10]  *Id.* ¶¶6-9.

[11]  *Id.* ¶¶4-5, 7-8, 13-14.

[12]  *Id.* ¶¶28-30.

Pursuant to its authority to promulgate rules, regulations and policies within its schools, SCASD has approved and authorized more than 100 extracurricular and co-curricular opportunities.[13] Participation is not just limited to students enrolled in classes at SCASD. School Board Policy No. 137 and 24 P.S. § 13-1327.1(f.1)[14] permit students residing within the school district who are enrolled in a home school program to participate in these programs, including athletics programs, if they submit a request to the Superintendent by the required deadline.[15] Charter school students residing within SCASD are also eligible to participate in its extracurricular and co-curricular activities.[16]

F.Y. and R.H. have been enrolled in parochial schools to further the religious beliefs of their parents and themselves.[17] Participation in religious instruction and activities, by F.Y. and R.H. as well as their parents, is an integral part of the parochial schools' educational programs.[18] Through their parochial school program, F.Y. and R.H. fulfill all applicable educational requirements in the Public School Code.[19] But while they are residents of SCASD, because they are neither enrolled in SCASD's schools itself, nor home schooled or charter-schooled, F.Y. and R.H. are ineligible

---

[13] *Id.* ¶¶15, 24.
[14] Beginning with the 2023-24 school year, subsections 13-1327.1(f.2)-(f.3) also apply to homeschooled students.
[15] *Id.* ¶¶27, 32.
[16] *Id.* ¶¶37-40.
[17] *Id.* ¶¶51, 67.
[18] *Id.* ¶¶52-54.
[19] *Id.* ¶42.

to participate in SCASD's programs.[20] Parent plaintiffs have requested that SCASD permit their children to participate in extracurricular and co-curricular activities, but these requests have been denied.[21] In response to Parent C.Y.'s request, the SCASD Superintendent responded via email in March 2023:

> After carefully considering it, we cannot grant your request to change our longstanding practice of not having private school students participate on our PIAA sports teams. The reason is that the district has ample, and sometimes excess, participation for our teams, so there is no need to expand. Additionally, if we allow private school students to take part, we could be taking away opportunities from SCASD students.[22]

Plaintiffs therefore allege that Defendants have "historically refused to grant Student Plaintiffs and other similarly situated parochial school students the ability to participate in extracurricular and co-curricular activities."[23] They now bring this civil rights action pursuant to 42 U.S.C. § 1983 for a violation of the Freedom of Religion Clause of the First Amendment to the United States Constitution, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[24] Plaintiffs seek declaratory judgment that Defendants' conduct is in violation of the Free Exercise and Equal Protection Clauses; an injunction of SCASD's alleged discriminatory conduct; an injunction requiring SCASD to permit

---

[20] *Id.* ¶¶55, 68.
[21] *Id.* ¶¶56-57.
[22] *Id.* ¶58.
[23] *Id.* ¶59.
[24] *Id.*

Student Plaintiffs and other similarly situated plaintiffs to participate in its extracurricular and co-curricular activities, and counsel fees and costs.[25]

### C.    Analysis

#### 1.    Section 1983

RRFP brings suit under 42 U.S.C. § 1983. Rather than serving as a substantive source of rights, Section 1983 provides a procedural vehicle for private plaintiffs to enforce the constitution when they suffer violations under color of state law.[26]  As set out in *Monell v. New York Department of Social Services*, a municipal body is a "person" who can be liable under Section 1983.[27] But a municipality can only be liable for its own actions; it cannot be vicariously liable for the actions of its employees. A municipal body acts through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."[28] This includes unconstitutional practices which are "so permanent and well settled as to constitute a custom or usage with the force of law."[29]

Here, RRFP alleges that SCASD and the Board has a "longstanding practice" of refusing to permit parochial school students to participate in extracurricular and co-curricular activities of SCASD.[30]  SCASD refers to this allegation as

---

[25]  Doc. 10 at 22-23.
[26]  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).
[27]  436 U.S. 658, 690 (1978).
[28]  *Id.*
[29]  *City of St. Louis v. Prapotnik*, 485 U.S. 112, 117 (1988).
[30]  Doc. 1 ¶¶58-60.

"conclusory,"[31] but RRFP provides factual support for this allegation by quoting from the SCASD Superintendent's email. As a superintendent is a school policymaker, a statement by a superintendent that a pattern of conduct has occurred is sufficient to plausibly allege such a pattern of historical fact.[32]

Even if this were not the case, no such longstanding practice is needed to impose municipal liability because the policies RRFP complains of were directly adopted by the school board itself. Any violation caused thereby is a municipal act.[33] Accordingly, either allegation of SCASD's longstanding practice, or of the complained of policy, sufficiently alleges a claim under Section 1983 if RRFP can also plausibly allege an underlying constitutional violation. The Court now turns to RRFP's Free Exercise claims.

### 2. Free Exercise

#### a. Burden on Religious Conduct

The Free Exercise Clause of the First Amendment to the United States Constitution prohibits Congress from making any law prohibiting the free exercise

---

[31] Doc. 10 at 8.

[32] *See Doe v. Williamsport Area Sch. Dist.*, No. , 2023 U.S. Dist. LEXIS 188445, at *17 (M.D. Pa. Oct. 19, 2023) ("Under less tenuous circumstances, a similar statement with less ambiguity and less distance between the speaker and the administrators might push a case over the line from conceivable to plausible.").

[33] *See Watson v. Abington Twp.*, 478 F.3d 144, 155 (3d Cir. 2007) ("Under *Monell*, a plaintiff shows that a policy existed 'when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict.'") (quoting *Bielvicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)).

of religion.[34] This right was reincorporated against the states through the Fourteenth Amendment.[35]

SCASD makes several arguments contending that the Defendants' actions imposed no legally cognizable burden on Plaintiffs' religious rights. Quoting a 1979 decision from the Eastern District of Tennessee, SCASD maintains that "[a]n essential element to a claim under the free exercise clause is some form of governmental coercion of actions which are contrary to religious belief."[36] According to SCASD, "[t]he School District is simply not compelling any of the Plaintiffs to act in violation of their conscience."[37] The allegation that Plaintiffs are forced to choose between their religious beliefs and the benefit of extracurricular participation, SCASD continues, is "a classic example of a false choice . . . . they could exercise their religious beliefs as they pleased, and their religious exercises would be unaffected by the statement made by the Superintendent."[38] SCASD finally contends that regardless of whether coercion has been applied, refusing to allow participation in SCASD's extracurricular programming imposes no constitutionally significant burden on religious exercise.[39] In sum, none of the cases provided by SCASD substantiates its claims.

---

[34] U.S. Const. amend. i.
[35] *Cantwell v. Connecticut*, 310 U.S. 296 (1940).
[36] Doc. 10 at 7 (quoting *Sequoyah v. Tenn. Valley Auth.*, 480 F.Supp. 608, 611 (E.D. Tenn. 1979)).
[37] *Id.* at 7.
[38] *Id.* at 8.
[39] *Id.* at 9.

Defendants mainly rely on outdated case law to overstate the burden required for a government policy to infringe on Free Exercise rights. Yet applicable precedent is clear that that burden can take the form of a denial of benefits. In 2017, the Supreme Court of the United States noted: "This Court has repeatedly confirmed that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercises of religion."[40] The Free Exercise Clause is affronted when laws "impose[] special disabilities on the basis of . . . religious status,"[41] which includes discrimination in the distribution of public benefits.[42] "The imposition of such a condition upon even a gratuitous benefit inevitably deter[s] or discourage[s] the exercise of First Amendment rights."[43] So where one is "put to the choice between [his faith] and receiving a government benefit," a cognizable burden has been imposed.[44] As the Supreme Court has held that this is not a "false choice,"[45] this Court will not do so either.

Next, enrolling a child in a parochial school to receive a religious education is a form of religiously motivated conduct protected by the Free Exercise Clause. The Free Exercise Clause strictly prohibits "any governmental regulation of

---

[40] *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 451 (2017).

[41] *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533 (1993).

[42] *Mitchell v. Helms*, 530 U.S. 793, 828 (2000).

[43] *Sherbert v. Verner*, 374 U.S. 398, 405 (1963).

[44] *Trinity Lutheran*, 582 U.S. at 465; *see also Carson v. Makin*, 142 S.Ct. 1987, 1997 (2022); *Espinoza v. Montana Dep't of Rev.*, 140 S.Ct. 2246, 2255, 2257 (2020); *Everson v. Bd. of Ed. of Ewing*, 330 U.S. 1, 16 (1947).

[45] *Id.*

religious *beliefs* as such."[46] But it also provides a "qualified protection against the regulation of religiously motivated conduct."[47] Nor may a court inquire into the centrality of the religious belief to the adherent's faith, as this task is "not within the judicial ken."[48] And it is of no moment whether that conduct is "mandatory" or "optional" according to the plaintiff's religious convictions.[49] The decision to place students into parochial schools may validly be considered religiously motivated conduct,[50] and conditioning educational benefits upon that religious conduct may violate the Free Exercise Clause.[51]

Therefore denying access to the public benefit of participation in extracurricular activities because of a child's religiously-motivated enrollment in parochial school offends the Free Exercise Clause if that denial is discriminatory. None of the cases cited by SCASD undermine this conclusion. By way of example, the Magistrate Judge in *Robbins by Robbins v. Indiana High School Athletics*

---

[46] *Sherbert*, 374 U.S. at 402-403 (citing *Cantwell*, 310 U.S. at 303).

[47] *Employment Div., Dep't of Human Res. v. Smith*, 485 U.S. 660, 671 n.13 (1988); *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 877 (1990); *Wisconsin v. Yoder*, 406 U.S. 205, 219-20 (1972).

[48] *DeHart v. Horn*, 277 F.3d 47, 55-56 (3d Cir. 2000) (en banc); *Employment Div. Dep't of Human Res. v. Smith*, 494 U.S. 872, 886-87 (1990) (plurality opinion).

[49] *Tenafly Eruv Ass'n v. Borough of Tenafly*, 308 F.3d 144, 171 (3d Cir. 2002).

[50] *See Trefelner v. Burrell Sch. Dist.*, 655 F.Supp. 2d 581, 595 (W.D. Pa. 2009) ("[P]laintiffs' action of enrolling A.T. in a parochial school was religiously motivated and would be afforded protection under the *Smith* framework."); *Combs v. Homer Ctr. Sch. Dist.*, 540 F.3d 231 (3d Cir. 2008) (holding that regulations of homeschooling did not violate the Free Exercise Clause because they were generally applicable, without questioning that the plaintiffs' religious convictions were sincerely held); *Yoder*, 406 U.S. at 215-219 (explaining that Wisconsin's compulsory school attendance law was contrary to the religious beliefs of the Amish plaintiffs, and therefore violated the Free Exercise Clause).

[51] *See Carson*, 142 S.Ct. at 1996.

*Association* held that the athletics transfer policy imposed no "undue burden" upon the student's religiously motivated transfer to a parochial school.[52]

The Court is not persuaded by this report and recommendation, for it failed to consider that "'[u]nder *Smith* and *Lukumi* . . . there is no substantial burden requirement when government discriminates against religious conduct."[53] The United States Court of Appeals for the Fifth Circuit's decision in *Walsh v. Louisiana High School Athletic Association* came down in 1980, and also applied an outdated standard.[54] Because more recent case law is clear that even an incidental burden on religious conduct violates the Free Exercise Clause if it is not imposed through a neutral and generally applicable policy, SCASD's argument that its policy does not impose "grave interference with important . . . religious ten[ets]"[55] applies an erroneous legal standard.

The more recent cases of *Chapman v. Pennsylvania Interscholastic Athletics Association* and *Pelletier v. Maine Principals' Association* both involved homeschooled students who were eligible to compete in their public school's athletic

---

[52]   941 F.Supp. 786, 792 (S.D. Ind. 1996) (Hussman, M.J.).

[53]   *Tenafly*, 308 F.3d at 170 (3d Cir. 2002). The Court does not opine on whether the transfer policy imposed even an incidental burden, but merely notes that because the Magistrate Judge applied the wrong legal standard, his report and recommendation has no persuasive value. The policy in *Robbins* would likely be considered neutral and generally applicable anyways, however, as it contained no exemptions. *Robbins*, 941 F.Supp. at 789.

[54]   616 F.2d 152, 157-58 (1980).

[55]   Doc. 10 at 11 ("To be an undue burden, there must be 'grave interference with important . . . religious tenents [sic],' or there must be state action which affirmatively compels students or parents to 'perform acts undeniably at odds with fundamental tenents [sic] of their religious beliefs.'") (citations omitted).

programming, but whose eligibility rules did not permit them to participate in a parochial school's athletics team instead.[56] Plainly, neither student was deprived of a public benefit due to the religiously motivated conduct of pursuing a homeschool education. Rather, they were unable to participate in a private school's athletics program, a right they never had in the first place. That is an obvious outcome, for the Free Exercise Clause is not offended where the government refuses to provide special treatment.[57] In contrast, the Western District of Pennsylvania held in *Trefelner ex rel. Trefelner v. Burrell School District* that when a student enrolled at a parochial school was denied participation in his local high school's marching band, this did amount to a violation of the Free Exercise Clause.[58]

Because Plaintiffs have adequately alleged a burden on their religious rights, the Court turns to the question of whether any unconstitutional discrimination is plausibly alleged.

---

[56] *Chapman v. Pa. Interscholastic Ath. Ass'n*, No. 1:14-cv-00193, 2014 U.S. Dist. LEXIS 84299, at *13-14 (M.D. Pa. June 18, 2014); *Pelletier v. Me. Principals' Ass'n*, 261 F.Supp. 2d 10, 12 (D. Me. 2003).

[57] *See Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 452 (1988).

[58] 655 F.Supp. 2d 581, 590 (W.D. Pa. 2009).

b.      **Neutrality and General Applicability**

1.      **Legal Standard**

As the Supreme Court of the United States explained in the landmark case of *Employment Division, Department of Human Resources of Oregon v. Smith*, "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable."[59] While the *Smith* test has weathered substantial judicial criticism,[60] the Supreme Court has declined to overturn it,[61] and this Court remains bound to apply it.

Although the neutral and general applicability tests are "interrelated,"[62] they are in fact distinct tests, and failing either triggers strict scrutiny. A law is not "neutral" when the government "proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."[63] The school board policies here are facially neutral, and there is no evidence of a discriminatory history or motivation in drafting them. Although a facially neutral policy can fail to be neutral

---

[59]  *Fulton v. City of Phila.*, 141 S.Ct. 1868, 1877 (2021) (citing *Smith*, 292 U.S. at 878-882).

[60]  *See, e.g.*, *Fulton*, 141 S.Ct. at 1883-84 (Barrett, J., Concurring) ("In my view, the textual and structural arguments against *Smith* are more compelling."); 1894 (Alito, J., Concurring); 1926 (Gorsuch, J., Concurring) ("*Smith* failed to respect this Court's precedents, was mistaken as a matter of the Constitution's original public meaning, and has proven unworkable in practice."); 1931 ("It's not as if we don't know the right answer. *Smith* has been criticized since the day it was decided. No fewer than Ten Justices—including six sitting Justices—have questioned its fidelity to the Constitution.").

[61]  *Id.* at 1876-77.

[62]  *Lukumi* 508 U.S. at 531-32.

[63]  *Fulton*, 141 S.Ct. at 1877 (citing *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S.Ct. 1719 (2018)).

in application,[64] the Court need not reach this question because the policy is not generally applicable under existing precedent.

A law is not generally applicable under *Smith* if it (1) "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions,"[65] or (2) "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."[66]

In *Trefelner*, the Western District of Pennsylvania found that a parochial student's exclusion from a school district's program, which also allowed district residents who were not enrolled in the school to participate in extracurricular activities, violated the Free Exercise clause.[67] Attempting to distinguish its case, SCASD points this Court to dicta in *Chapman v. Pennsylvania Interscholastic Athletic Association*.[68] In *Chapman*, my colleague, the Honorable Yvette Kane, distinguished the facts from those in *Trefelner* by explaining that "the ultimate effect of these exemptions [in *Trefelner*] was that the <u>only</u> students in the district who were not eligible to play at the public schools were students at private religious schools."[69]

---

64   *Lukumi*, 508 U.S. at 534.
65   *Fulton*, 141 S.Ct. at 1877; *see also Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981); *Sherbert*, 374 U.S. at 402-10.
66   *Fulton*, 141 S.Ct. at 1877.
67   655 F.Supp. 2d 581, 590 (W.D. Pa. 2009).
68   No. 1:14-cv-00192, 2014 U.S. Dist. LEXIS 84299, (M.D. Pa. June 18, 2014).
69   *Id.* at *15. *Chapman* remains distinguishable because it dealt with an eligibility rule applying to "all students not enrolled full-time." *Id.* at *17. It also involved a plaintiff who wished to participate in extracurricular activities at the school of his choice, when he was already eligible

SCASD's remaining arguments therefore hinge on the fact that it is not solely refusing to exempt parochial students from its programming; in other words, SCASD exempts some analogous secular conduct, but it also does not exempt other analogous secular conduct, so it is not solely targeting religious activity.[70]

*Smith* and *Church of Lukumi Babalu Aye v. City of Hialeah* left some room for ambiguity because they are two extremes at opposite ends of the general applicability spectrum. *Smith* involved an "across-the-board" law making the ingestion of peyote a criminal offense.[71] *Lukumi* involved a "gerrymandered" city ordinance amidst a sea of carefully crafted exemptions, with the effect of only targeting the ritual animal sacrifice traditions of the Santeria religion.[72] *Lukumi* therefore stated that laws fail to be generally applicable when, "in a selective manner," they "impose[] burdens only on conduct motivated by religious belief."[73] The Supreme Court has also stated that it is "careful to distinguish" laws which are "neutral and generally applicable without regard to religion," and laws "that single out the religious for disfavored treatment."[74]

---

to participate under applicable in another school's activities under the PIAA rule. *Id.* Thus, no benefit was denied due to the plaintiff's religiously-motivated homeschooling.

[70] *See* Doc. 14 at 3 ("There is no allegation that the policy excluding private school students resulted (or didn't result) in only parochial school students being excluded from participation in school district extracurricular activities.").

[71] *Smith*, 494 U.S. at 884-85.

[72] *Lukumi*, 508 U.S. at 534-539.

[73] *Id.* at 543.

[74] *Trinity Lutheran*, 582 U.S. at 460.

There has therefore been some judicial confusion regarding cases in which some analogous secular conduct is exempted from a regime, but other analogous secular conduct is not exempted.[75] "Some decisions apply this special rule if multiple secular exemptions are granted. Others conclude that even one secular exemption is enough."[76] In a concurring opinion in *Fulton*, Justice Gorsuch opined that "this Court began to resolve at least some of the confusion surrounding *Smith's* application in *Tandon* [*v. Newsom*]."[77] In *Tandon*, the Supreme Court stated:

> Government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise. It is no answer that a State treats some comparable secular business or other activities as poorly as or even less favorably than the religious exercise at issue.[78]

Some have cast doubts as to *Tandon*'s precedential value, given that it was an emergency docket decision decided upon an application for injunctive relief.[79] Yet

---

[75]  *See, e.g.*, *Stormans, Inc. v. Wiseman*, 794 F.3d 1064 (9th Cir. 2015); *Fulton*, 141 S.Ct. at 1930 (Gorsuch, J., Concurring) ("[J]udges across the country continue to struggle to understand and apply *Smith*'s test even thirty years after it was announced. In the last nine months alone, this Court has had to intervene at least half a dozen times to clarify how *Smith* works.").

[76]  *Fulton*, 141 S.Ct. at 1921 (Alito, J., Dissenting) (citations omitted) (collecting cases).

[77]  *Fulton*, 141 S.Ct. at 1930-31.

[78]  141 S.Ct. 1294, 1296 (2021) (citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 73 (2020) (Kavanaugh, J., Concurring)).

[79]  *See, e.g.*, Alexander Gouzoules, *Clouded Precedent: Tandon v. Newsom and its Implications for the Shadow Docket*, 70 BUFF. L. REV. 87, 93 (2022) ("[S]ome courts will treat *Tandon* as something less than a fully binding merits decision yet something more than a one-off grant of extraordinary relief to a particular set of parties . . . [o]thers will apply it as a definitive articulation of Free Exercise Clause jurisprudence."); Trevor N. McFadden and Vetan Kapoor, *The Precedential Effects of the Supreme Court's Emergency Stays*, 44 HARV. J. L. & PUB. POL'Y 827, 832-35, 882 (2021) ("When the full Supreme Court grants a stay application, lower courts should accord that decision great weight, unless there is compelling reason not to do so."); *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 S.Ct. 173, 180-81 (explaining

our Court of Appeals has found *Tandon* to be "significant intervening Supreme Court precedent" providing "crucial guidance."[80] Even if *Tandon* were not considered instructive, it merely reaffirms the approach already supported by decisions within this Circuit.

In *Fraternal Order of Police v. City of Newark*, then-Judge Alito explained that a police department's medical exemption to a no-beard policy, along with its refusal to allow a religious exemption, "indicate[d] that  the Department ha[d] made a value judgment that secular (i.e., medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not."[81] The discriminatory conduct in *Fraternal Order of Police* was not the result of a gerrymandered policy, as in *Lukumi*—it was the failure to provide a religious exemption after establishing a secular one, notwithstanding the fact that other police officers remained subject to the no-beard policy.

Similarly, in *Blackhawk v. Pennsylvania*, again authored by then-Judge Alito, the Commonwealth of Pennsylvania imposed a permit fee for keeping wild animals to raise revenue and to discourage keeping wild animals in captivity, but categorically waived wildlife permit fees for zoos and nationally recognized

---

that summary orders "have considerably less precedential value than an opinion on the merits.").

[80]   *See Clark v. Governor of N.J.*, 53 F.4th 769, 780 (3d Cir. 2022).

[81]   170 F.3d at 366.

circuses.[82] Its refusal to waive that fee for the plaintiff, a Native American who kept two bears in captivity for religious reasons, violated the Free Exercise Clause notwithstanding the fact that the permit fee was in no way targeted towards religious reasons for keeping wild animals in captivity.

As authority from the Supreme Court and Third Circuit demonstrates, therefore, the fact that SCASD's no-private-student policy is not a no-parochial-student policy is immaterial to the general applicability analysis. The Free Exercise Clause is not affronted where a person is denied special treatment in the context of a religion-neutral policy.[83] But if an exemptions regime exists, the failure to grant an exemption to religiously motivated conduct is considered discriminatory because it evidences a decision "that secular motivations are more important than religious motivations."[84] Whether the exemptions are individualized or categorical, "the decision whether a regulation violates a plaintiff's constitutional rights hinges on a comparison of how it treats entities or behavior that have the same *effect* on its objectives."[85] "Comparability is concerned with the risks various activities pose, not the reasons why people" engage in that conduct.[86]

---

[82]   381 F.3d at 210-11.

[83]   *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 452 (1988).

[84]   *Fraternal Order of Police*, 170 F.3d at 365.

[85]   *Lighthouse Inst. For Evangelism v. City of Long Branch*, 510 F.3d 253 (3d Cir. 2007).

[86]   *Tandon*, 141 S.Ct. at 1296 (citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 79 (2020) (Gorsuch, J., Concurring)).

## 2.      Application

SCASD presents its policy as one prohibiting private students' involvement in extracurricular programming and argues that by this definition its policy would be generally applicable.[87] But by carving exemptions out of the definition of a policy, a defendant can make any policy appear generally applicable. This approach is clearly circular for the obvious reason that "every law applies to everything it applies to."[88] Where a complaint regards the unequal denial of government benefits, defining the government policy by who the benefits are denied to excludes the entire point of the analysis. Moreover, SCASD specifically passed policies to permit homeschooled and charter-schooled students' participation because the status quo policy is that students must actually be enrolled in SCASD to participate. The Court therefore rejects SCASD's framing.

Instead, the policy is more accurately stated at a broader level of generality— only students enrolled in SCASD may participate in its extracurricular activities. That general policy is subject to two categorical exemptions for charter-schooled and homeschooled students.

The Superintendent's email provides two possible reasons for refusing to allow private school students (including parochial students) to participate in its

---

[87]  Assuming that charter schools are not "private," an issue on which the Court need not opine.

[88]  Douglas Laycock & Steven T. Collis, *Generally Applicable Law and the Free Exercise of Religion*, 95 NEB. L. REV. 1, 16 (2016).

extracurricular activities: "the district has ample, and sometimes excess, participation for our teams, so there is no need to expand. Additionally, if we allow private school students to take part, we could be taking away opportunities from SCASD students."[89]

While Free Exercise law is complex in this area,[90] applying it here is straightforward. As discussed, SCASD grants exemptions to homeschooled and charter-schooled students. These students are analogous to parochial students in relation to the reason for denying this benefit. Just as a choice to wear a beard for medical or religious reasons equally undermined the "uniform appearance" policy in *Fraternal Order of Police*,[91] whether it is a homeschooled, charter-schooled, or parochially-schooled student, any non-enrolled student's participation in extracurricular activities equally undermines the stated aims of preventing excess participation and allowing spots for enrolled students.

SCASD points to the public-private distinction dividing eligible and noneligible students, but this is irrelevant even if true,[92] because whether a student attends a public or private school bears no influence on whether their extracurricular participation will overcrowd SCASD's programs. Whether an exemption is required

---

[89] Doc. 1 ¶58.

[90] *See Fulton*, 141 S.Ct. at 1921-22 (Alito, J., Dissenting) (discussing *Smith* cases relating to secular exemptions from COVID-19 regulations and concluding that while "*Smith* seemed to offer a relatively simple and clear-cut rule that would be easy to apply[,] [e]xperience has shown otherwise.").

[91] 170 F.3d at 366.

[92] This distinction depends on whether charter schools are "public" or "private" institutions.

for legal compliance is similarly irrelevant,[93] as our Court of Appeals held in *Fraternal Order of Police*.[94]

The cases cited by SCASD are unhelpful to the Court's consideration here, for none of them contained any exemptions at all, and so none even reached the analysis of whether exempted conduct was analogous. The Third Circuit held that regulations on homeschooling did not violate the Free Exercise Clause in *Combs v. Homer-Center School District*, but only because Act 169 "impose[d] the same requirements on parents who home-school for secular reasons as on parents who do so for religious reasons," and there was no waiver mechanism creating any exemption.[95] In *Chapman*, the PIAA's Attendance Rule "applied equally to <u>all</u> students not enrolled full-time;" the rule did not reach any students who were not homeschooled, so there was no exemption to consider.[96] While not cited by SCASD, *Webb v. City of Philadelphia* also makes the point.[97] There, the Third Circuit distinguished a police department's uniform appearance policy from that in *Fraternal Order of Police* by explaining that although it prevented plaintiff from wearing her hijab, it did not violate the Free Exercise Clause because it "contain[ed]

---

[93] *See* 24 P.S. § 13-1327.1(f.1)-(f.2) (LEXIS 2023).
[94] *See* 170 F.3d at 365 (fact that medical exemption to no beard policy was legally required by the ADEA was not significant to the general applicability analysis).
[95] 540 F.3d at 242.
[96] 2014 U.S. Dist. LEXIS 84299, at *17.
[97] 562 F.3d 256 (2009).

no exceptions, nor [was] there evidence the City allows other officers to deviate from it."[98]

Consequently, the policy is not generally applicable, and is subject to strict scrutiny. The Court will therefore examine whether Plaintiffs have adequately alleged that the policy cannot survive strict scrutiny.

### c.    Strict Scrutiny

To survive strict scrutiny, the extracurricular policy "must advance interests of the highest order and must be narrowly tailored in pursuit of those interests."[99] Here, the tailoring analysis overlaps completely with the analysis of SCASD's categorical exemptions. Where a regime refuses to exempt religious conduct but imposes a categorical exemption for secular conduct which threatens an analogous harm to the stated interest, it is a foregone conclusion that the regime is underinclusive.[100] For if SCASD had a policy narrowly tailored to prevent overcrowding of its extracurricular programming, it would not have had the homeschool and charter school exemptions in the first place. SCASD's regime is therefore not narrowly tailored to achieve its stated interest, and therefore fails to survive strict scrutiny.

---

[98] *Id.* at 262.

[99] *Lukumi*, 508 U.S. at 546.

[100] *See Blackhawk*, 381 F.3d at 215 ("If the Commonwealth wishes to reduce the number of wild animals held in captivity or to reduce the number held by persons who cannot afford a $ 100 or $ 50 annual fee (and these are the only effects that denying the exemptions at issue can have), the scheme is substantially underinclusive for the reasons already set out.").

Based on the facts presently before the Court, the motion to dismiss must be denied. If SCASD proffers different justifications for its scheme of exemptions later in this litigation, such that strict scrutiny does not apply, it might succeed in defending the status quo. But such a justification must actually be grounded in some fact distinguishing homeschooled and charter-schooled students from parochially schooled students, in relation to the risks posed by allowing their participation.[101]

### 3.    Equal Protection Clause

The Equal Protection Clause provides that "no . . . state shall deny any person under its jurisdiction the equal protection of the laws."[102] A plaintiff states an Equal Protection Clause claim by alleging "that a state actor intentionally discriminated against the plaintiff because of membership in a protected class."[103] "Classifications . . . impacting certain fundamental constitutional rights, are subject to heightened

---

[101] *See, e.g.*, *Fraternal Order of Police*, 170 F.3d at 366 (explaining the general applicability of a no beard policy premised on uniform appearance was not undermined by an exemption for undercover police officers, as they by definition do not affect the department's perceived appearance); *Lighthouse Inst. For Evangelism*, 510 F.3d 276 (holding that a zoning plan which prohibited buildings meant for civil assembly in the downtown area was generally applicable "despite its allowance of certain categories of secular assemblies because . . . its prohibition applies evenly to all uses that are not likely to further Long Branch's goal of a revitalized, 'vibrant' and 'vital' downtown . . . [t]he uses it does allow – restaurants, theaters, bars, clubs, retail shops – are likely to further its aims, not harm them"); *King v. Governor of N.J.*, 767 F.3d 216, 243-43 (3d Cir. 2014) (explaining that alleged exemptions to a law prohibiting sexual orientation change efforts on minors did not undermine its general applicability because nothing in the record suggested they were equally harmful to minors).

[102] U.S. Const. amend. xiv §1.

[103] *Shoemaker v. City of Lock Haven*, 906 F.Supp. 230, 283 (M.D. Pa. 1995) (quoting *Henry v. Metro Sewer Dist.*, 922 F.2d 332, 341 (6th Cir. 1990)).

scrutiny."[104] And because one of those fundamental rights is the right of Free Exercise, the equal protection and free exercise questions become "functionally identical and it would be redundant to treat them separately."[105] Therefore, the Court will deny the motion to dismiss RRFP's Equal Protection claim for the same reasons it denies the motion to dismiss RRFP's Free Exercise Claim; RRFP plausibly alleges the violation of a fundamental right.

## III.   CONCLUSION

Plaintiffs attend parochial schools as a form of religious exercise. Other students attend homeschool and charter school for their own reasons. Under the Free Exercise Clause, religious reasons for not attending public school must be considered at least as important as any secular reason. Plaintiffs have adequately alleged that SCASD's failure to extend its exemption to students who do not attend its school for religious reasons offends the Free Exercise Clause, as it denies a government benefit on the basis of religious exercise through a law which is not generally applicable. Accordingly, Defendants' motion to dismiss pursuant to Rule 12(b)(6) is denied.

---

[104] *Artway v. Attorney Gen.*, 81 F.3d 1235, 1267 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

[105] *Trefelner*, 655 F.Supp. 2d 581, 590 (W.D. Pa. 2009) (quoting *Hill v. City of Scranton*, 411 F.2d 118, 126 (3d Cir. 2005)).

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge